## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

WILDEARTH GUARDIANS
312 Montezuma Ave.
Santa Fe, NM 87501

       Plaintiff,

v.

UNITED STATES BUREAU OF LAND MANAGEMENT
1849 C Street, NW
Washington, DC 20240,

UNITED STATES DEPARTMENT OF INTERIOR
1849 C Street, NW
Washington, DC 20240,

DIRK KEMPTHORNE, in his official capacity as Secretary of the Interior
1849 C Street, NW
Washington, DC 20240,

and

LINDA RUNDELL, in her official capacity as State Director
Of the New Mexico Bureau of Land Management Office
1474 Rodeo Road
Santa Fe, NM  87505,

       Defendants.

---

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

---

## INTRODUCTION

1.      Plaintiff, WildEarth Guardians brings this action against Defendants, the United States Bureau of Land Management ("BLM"), United States Department of Interior, Dirk Kempthorne, in his official capacity as U.S. Secretary of the Interior, and Linda Rundell in her official capacity as State Director of the New Mexico BLM Office to require them to carry out their duties under the National Environmental Policy Act ("NEPA") when granting exceptions to seasonal timing closures on oil and gas drilling in sensitive habitat which Defendants have put in place to protect wildlife such as pronghorn antelope, elk and deer.  The break-neck pace of drilling public lands for oil and gas has led the BLM to brush aside wildlife closures and timing limitations over 441 times since 2003, all to ensure the rigs keep working.  The result is no rest for weary wildlife.  The BLM is endangering wildlife by failing to implement promises it made to the public to reduce impacts to wildlife from oil and gas drilling. A suite of wildlife species is being impacted: mule deer, elk, and pronghorn. Other wildlife who would benefit from decreased human activity during seasonal closures include mountain lions, turkeys, and black bears.

2.      BLM is also reneging on its promises through "backroom" communication with industry: in the 441 times that the BLM's Farmington Field Office has granted exceptions to seasonal closures, it has never notified the public before granting the exceptions. Nearly half of the Farmington exceptions were granted in three areas: the Rosa, Middle Mesa, and Rattlesnake Canyon areas.  Many of the areas at issue have already been badly damaged by oil and gas drilling, and wildlife therefore deserve every chance at surviving the bleak habitat conditions they face. They are not being given this chance. Rather, the BLM has almost always granted exceptions when companies request them.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), and 1346(a)(2) (civil action against the United States).  This Court has authority to grant the requested relief pursuant to 5 U.S.C. §§ 701-706 (Administrative Procedure Act), 2201 (declaratory judgment), and 2202 (further relief).  An actual controversy exists between the parties within the meaning of the Declaratory Judgment Act.  28 U.S.C. § 2201.

4.      Defendants BLM, United States Department of Interior, and Dirk Kempthorne, in his official capacity as U.S. Secretary of the Interior officially reside in the District of Columbia. Therefore venue is proper in this court pursuant to 28 U.S.C. § 1391(e).

**PARTIES**

5.      Plaintiff WILDEARTH GUARDIANS ("Guardians") sues on behalf of itself and its adversely affected members.  Guardians is a new non-profit environmental organization created on January 28, 2008, by the merger of three organizations: Forest Guardians; Sinapu; and Sagebrush Sea Campaign.  Guardians has over 4,500 members, some of whom reside in the District of Columbia, but many of whom reside in the areas of the country where the wildlife impacted by Defendants' granting of exceptions to seasonal closures reside.

6.      Guardians has long been engaged in oil and gas drilling issues on BLM land in order to protect wildlife, wild places and wild rivers and prevent climate change.  Guardians submits comments on resource management plans and applications for permits to drill and protests certain oil and gas lease sales and will continue to do so.  Guardians also works with the New Mexico Game and Fish Department and New Mexico Game Commission to work towards mitigating impacts from oil and gas extraction and related activities on BLM land or BLM mineral estates and will continue to do so.  Timely and complete information generated by a NEPA analysis of seasonal wildlife closure exceptions would assist Guardians in its oil and gas

work.  Guardians is injured and will continue to be injured by Defendants failure to provide Guardians with these NEPA analyses.

7.      Guardians' members frequently use and enjoy the areas discussed in this complaint, and their habitats, for wildlife viewing, recreational, aesthetic, spiritual and scientific activities and will continue to do so.  Guardians' members have specific and concrete future plans to visit and enjoy these areas.

8.      Defendant, UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is an agency of the United States Government with the United States Department of Interior. BLM is responsible for managing much of the mineral estate owned by the United States including oil and gas rights in New Mexico.

9.      Defendant, UNITED STATES DEPARTMENT OF INTERIOR is an agency of the United States Government within which is located the BLM.

10.      Defendant, DIRK KEMPTHORNE is the Secretary of the United States Department of the Interior.  As such he has ultimate responsibility for implementation of NEPA with regard to BLM's management of oil and gas rights owned by the United States in New Mexico.  He is sued in his official capacity.

11.      Defendant, LINDA RUNDELL is State Director of the New Mexico BLM Office. She is sued in her official capacity.

**LEGAL BACKGROUND**

## I.    THE NATIONAL ENVIRONMENTAL POLICY ACT

12.    The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, is our nation's basic charter for the protection of our environment. It "contains 'action forcing' provisions to make sure that federal agencies act according to the letter and spirit of the Act." 40 C.F.R. § 1500.1.

13.    The Council on Environmental Quality ("CEQ") was created under NEPA to promulgate regulations "to tell federal agencies what they must do to comply with the procedures and achieve the goals" of NEPA. Id.

14.    The fundamental purpose of NEPA is to improve the decision making of federal agencies by requiring an analysis of the environmental impacts of a proposed action and an exploration of alternatives to that action that would reduce or eliminate such impacts. The primary vehicle for such an analysis is an Environmental Impact Statement ("EIS") prepared by the acting agency. 42 U.S.C. § 4332(2)(c).

15.    An EIS is required for all federal actions that significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(c). An EIS must be prepared and circulated for public review and comment *prior* to any major federal action that may have a significant effect on the environment. Id. 40 C.F.R. §§ 1502.5, 1508.3. Federal actions include the adoption of "formal documents establishing an agency's policies which will result in or substantially alter agency programs," the adoption of "formal plans, such as official documents prepared or approved by federal agencies which guide or prescribe alternative uses of federal resources," and the adoption "of programs, such as a group of concerted actions to implement a specific policy or plan." 40 C.F.R. §§ 1508.18(b)(1), (2), (3). Federal actions also include "[a]pproval of specific projects,

such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision[.]"  40 C.F.R. § 1508.18(b)(4).

16.    When a federal agency is not certain whether an EIS is required, it must prepare an Environmental Assessment (EA).  40 C.F.R. §§ 1501.3, 1501.4, 1508.9.  If the EA concludes that the proposed project will have no significant impact on the human environment, the agency may issue a Finding of No Significant Impact (FONSI), and proceed with the proposed action.  If the agency concludes that there may be a significant effect, then it must prepare an EIS.  40 C.F.R. § 1501.4.  By requiring agencies to prepare NEPA documents, Congress intended to help prevent or eliminate damage to the environment by focusing government and public attention on the environmental effects of proposed agency action.

**A.    Disclosure of the Project's Purpose and Need, Affected Environment and Impacts.**

17.    A key component of NEPA is the requirement to disclose the underlying purpose and need for the proposed action.  40 C.F.R. §§ 1502.10(d); 1502.13.

18.    Once defined, the agency must also describe the "affected environment" of the proposed action.  40 C.F.R. § 1502.15.

19.    Furthermore, NEPA and its implementing regulations require that when preparing an EA, agencies must take a hard look at the potential impacts of a project, and ensure that when a FONSI is made, the EA convincingly concludes that no significant impacts will occur in order to forego an EIS.  An agency must supply a convincing statement of reasons why potential effects are insignificant.  The agency's statement of reasons is crucial to determining whether the agency took a 'hard look' at the potential environmental impact of a project.

20.    CEQ regulations implementing NEPA recognize that intelligent decision making can only derive from high quality information.  EAs must provide "evidence and analysis" to

support a conclusion that a FONSI is appropriate or whether a full EIS is required.  40 C.F.R. §

1508.9.  Information included in NEPA documents "must be of high quality.  Accurate scientific

analysis ... [is] essential to implementing NEPA."  40 C.F.R. § 1500.1(b).  Where an agency has

outdated, insufficient, or no information on potential impacts, it must develop the information as

part of the NEPA process.

### B.    Consideration of Alternatives to the Proposed Action.

21.    In preparing an EIS, a federal agency must consider alternatives to the proposed

action.  42 U.S.C. § 4332(2)(c)(iii).  The identification and consideration of these alternatives is

the "heart" of the NEPA process.  Federal regulations require federal agencies to "rigorously

explore and objectively evaluate all reasonable alternatives."  40 C.F.R. § 1502.14(a).

### C.    Assessment of Mitigation Measures.

22.    NEPA and its implementing regulations require that federal agencies take a "hard

look" at measures to mitigate environmental impacts.  Agencies are required to develop, discuss

in detail, and identify the likely environmental consequences of proposed mitigation measures.

40 C.F.R. § 1508.25(b); 40 C.F.R. § 1502.14(f); 40 C.F.R. § 1502.16(h); 40 C.F.R. § 1505.2(c).

23.    Furthermore, a decision to proceed with a project must not be based on arbitrary

assumptions about the success of mitigation measures or promises of proposed future action.

Federal case law has made abundantly clear that a perfunctory description or mere listing of

mitigation measures is insufficient to support a FONSI.  Rather, mitigation measures must be

sufficiently evaluated in order to enable the agency and the public to properly evaluate the

severity of the adverse effects of a proposed project before making a final decision.

### D.    Analysis of Cumulative Impacts.

24.     The CEQ's implementing regulations provide that federal agencies must consider cumulative impacts in determining the scope of an environmental impact statement.  40 C.F.R. § 1508.25(c)(3).

25.     Cumulative impacts are impacts on the environment which result from a combination of the incremental impact of the proposed action, and other past, present, and reasonably foreseeable future actions whether taken by the federal government or others.  40 C.F.R. § 1508.7.

26.     Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.  Id.

27.     In determining the scope of an environmental impact statement, agencies shall consider cumulative actions that have cumulatively significant impacts when viewed with other proposed actions.  See 40 C.F.R. § 1508.25(c)(3).

28.     The fundamental objective of NEPA is to ensure that an "agency will not act on incomplete information only to regret its decision after it is too late to correct." Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 371 (1990) (citation omitted). An essential part of this information comes from the public.  NEPA's implementing regulations explicitly provide that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b).  Moreover, NEPA's implementing regulations require federal agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a).

29.     NEPA requires agencies to take a "hard look" at environmental consequences of proposed actions and to broadly disseminate relevant environmental information. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989); Grand Canyon

Trust v. F.A.A., 290 F.3d 339, 341 (D.C. Cir. 2002).

30.     The fact that a decision was "tiered" to an EIS in no way absolves BLM of its

obligation to thoroughly analyze the site-specific impacts and to involve the public in that site-

specific analysis. See e.g. Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208,

1214 (9th Cir. 1998) (rejecting claim that tiering to a programmatic EIS obviates the agency's

obligation to conduct a thorough assessment of site-specific project impacts, including the

requirement of preparing a site-specific EIS if necessary).


## II.     THE ADMINISTRATIVE PROCEDURES ACT

31.     Under the Administrative Procedure Act ("APA"), a reviewing court must "hold

unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law," as well as agency action that was taken "without

observance of procedure required by law." 5 U.S.C. § 706(2).


## FACTS

## I.     IMPACTS TO WILDLIFE FROM BLM'S CONSISTENT GRANTING OF EXCEPTIONS TO SEASONAL CLOSURES OF SPECIALLY DESIGNATED AREAS

32.     When elk and mule deer migrate south to New Mexico for the winter, they face an

explosion of new well drilling, pipeline and road construction, and other high-impact activities

during months when seasonal closures are supposed to protect the animals from disturbance.

Area pronghorn, already much-reduced from historic herd sizes, face similar scenarios in key

areas. Altogether, BLM has allowed seasonal closures to be breached at least 441 times, to the

detriment of these native ungulates.

33.    Timing closures are widely adopted by the BLM to reduce the impacts of oil and gas drilling impacts on wildlife species. These closures include limits on the time of day and time of year when various high-impact activities, such as new well drilling, pipeline and road construction, are allowed. BLM's tendency to brush these promises aside for the convenience of industry is explicitly admitted by the agency itself.   In a BLM email to ConocoPhillips dated March 6, 2006 BLM stated:  "…we have been very liberal in granting exceptions."[1]

34.    The BLM is allowing oil and gas companies to routinely breach seasonal closures in New Mexico, with little to no regard to the animals those closures were designed to protect, which include mule deer, elk, and pronghorn. The breach  of closures are occurring throughout closure periods, are usually granted in under a week, and often include the justification that drill rigs need to keep working.

35.    In the hundreds of times the BLM Farmington Field Office has granted exceptions to wildlife closures, there has been no process to advise the public before BLM granted the exceptions.

36.    Nearly half of the Farmington exceptions were granted in three areas: the Rosa, Middle Mesa, and Rattlesnake Canyon Specially Designated Areas.  The basis of BLM's Special Designation of these areas is wildlife.  According to the BLM itself, in many of the specially designated areas in which it is granting exceptions, there has already been extensive habitat fragmentation due to the proliferation of wells, roads, pipelines, compressors, and other petroleum extraction infrastructure across the landscape.

Why Seasonal Closures are Needed

37.    BLM has adopted seasonal closures and then allowed those closures to be systematically violated in the area covered by the Farmington Field Office. This field office is

---

[1] BLM email to ConocoPhillips dated March 6, 2006

located in the northwest corner of the state, overlying the San Juan Basin. The basin is already

intensively drilled for oil and gas, with thousands of additional wells on the horizon. As the

picture below demonstrates, it is ground zero for oil and gas extraction in New Mexico, and the

state's wildlife is paying the price.

.



**Oblique view of gas field infrastructure in Farmington Field Office of the
San Juan Basin. Image provided by SkyTruth (www.skytruth.org).**

*Native Ungulates in Farmington*

      38.    In 2003, Farmington adopted a Resource Management Plan ("RMP"), which

authorizes 9,942 additional wells. The RMP prescribes seasonal timing limitations on 483,807

acres.[2] The timing limitations primarily apply in specially designated areas (SDAs) that are

supposed to protect key wildlife habitat.

      39.    The RMP provides an overview of area mule deer and elk herds and discusses the

critical nature of the habitat managed by BLM and the need for timing limitations:

> Mule deer and elk are found most often on FFO [Farmington Field Office] land
> north of US 550, and are much less common south of the highway due to the lack
> of suitable habitat (BLM 1988). Deer and elk population density on FFO land
> varies by location and time of year. In most years, a large influx of migratory
> mule deer and a lesser number of elk takes place during the winter. Most of these
> animals are found on FFO land near the Colorado/New Mexico state line and
> adjacent to National Forest and Jicarilla Apache reservation lands. Much of this
> habitat on FFO land is considered critical winter range. *TLs [timing limitations]*
> *currently in place in the Laguna Seca Mesa SMA and other winter habitat*
> *provide some protection against disruptions in their habitat when fawning*
> *or calving is occurring.*
> Resident deer density is much lower than winter population levels as determined
> from browse studies and helicopter surveys conducted each year…[3]

      40.    Similarly, the RMP discusses the declining status of area antelope and the likely

factors behind that decline, including habitat destruction and human disturbance:

> Several small populations of pronghorn antelope (*Antilocapra americana*) reside
> in the area north and east of US 550 near Angel Peak and Ensenada Mesa. There
> are also remnants of a once thriving population of antelope in the Twin Mounds
> area. The numbers of these animals have been declining over the past 10 years.
> Studies are currently in progress to determine the cause of this decline.
> Preliminary indications are that the cause may be attributable to factors such as
> habitat quality and predation (Hanson 2001). It has been documented that
> antelope disperse widely over Ensenada Mesa when fawning. Traffic and other
> human activities can cause does to leave their fawns, leaving them vulnerable to
> predators.
> When human disruptions are limited in the habitat during the first 10 days to 2
> weeks of a fawn's life, it can remain under cover until it is strong enough to travel
> with the herd, greatly improving its chances for survival (Hanson 2002). About
> 100 antelope were released on AFO land in and near the planning area a few years
> ago but most of these have disappeared, leaving only an occasional pronghorn
> antelope to be seen (Silva 2001).[4]

---

[2] FFO RMP at pp. 5, 2-6 (Table 5), and Map 2-11.
[3] FFO RMP Final Environmental Impact Statement (FEIS) at p. 3-41. Emphasis added.
[4] *Id.* at pp. 3-41 to 3-42. Emphasis added.

41.    The RMP further states that the wildlife management areas are supposed to be

managed to increase native ungulate herds:

> HMPs [Habitat Management Plans] have been developed for some of the wildlife
> management areas such as Rattlesnake Canyon and Crow Mesa. These areas are
> managed for big game and other wildlife on Farmington Field Office land (BLM
> 1997, 1999b). These areas are characterized by deep canyons, piñon-juniper
> woodlands with stringers of ponderosa pine, and areas dominated by big
> sagebrush. The objectives of these HMPs are to increase the year-round resident
> mule deer and elk populations, contribute to the stabilization of the watersheds,
> and improve the existing biological diversity. Actions planned for the HMP areas
> include improving the quantity and quality of forage, water, and protective cover
> for deer and elk, and increasing ground cover to reduce soil erosion (BLM 1997,
> 1999b).  The condition of wildlife habitats are [sic] affected by the multiple uses
> of the land, including mineral extraction, livestock grazing, recreation activities,
> and fire management.[5]

42.    BLM is not managing to increase year-round mule deer, elk, or pronghorn

populations. Rather, the agency is brushing away the promises it made in the RMP to protect

these native animals, all for the benefit of the oil and gas industry.

43.    Timing limitations are a promised mitigation in more than a dozen special areas

within the RMP,[6] but exceptions to seasonal closures are being granted in the following areas:

**Carracas Mesa Recreation Area**.

44.    There is a timing stipulation from November 1 – March 31 across the entire SDA,

and from April 1 – July 15 in designated elk calving habitat. This SDA comprises 8,616 acres, of

which 3,201 acres contain federal minerals.

45.    BLM describes this area as special in the Farmington Field Office because of its

"relatively undisturbed natural environment." Elk using this area in the winter number

approximately 150-300 animals, and wintering deer average 400-800 animals. BLM describes

the Carracas SDA as having "extremely high" deer densities during the winter and considers it

---

[5] *Id.* at p. 3-42. Emphasis added.
[6] FFO RMP at pp. A-1 to A-6

"very important to a relatively large number of deer and a lesser number of elk during a critical time of their life cycle."[7] The goal for this area is "This site should be managed to protect and enhance wildlife, with a secondary emphasis on recreation." Seasonal restrictions are provided as a management prescription in the RMP.[8]

46.    BLM has allowed the closure in Carracas Mesa, considered a high priority SDA, to be breached at least seven times since the September 2003 RMP, including multiple times in the elk calving area. In reviewing Energen requests to drill or complete two wells during a one-month exception from mid-June to mid-July 2007, the BLM described threats facing the Carracas elk population:

> The Carracas Mesa elk calving area, primarily the top of Quintana Mesa and Eul Canyon, provide a relatively undisturbed habitat for cow elk to give birth during the spring. In recent years elk numbers within this area have declined due mainly to hunting pressure.

47.    BLM also recognized the severe habitat fragmentation in the area of the request due to oil and gas development. The agency further noted that deer densities were "very high" at the time. It granted the request anyway.[9]  In March 2006, BLM described high deer densities in the Carracas SDA, of 19.8-93.8 deer per square mile. The agency also described the habitat as in poor condition throughout much of the SDA and "barely capable of meeting the forage demands of the migratory deer..." Nonetheless, it allowed Williams to commence well pad and road construction for three new wells during the closure.[10]

**Cereza Canyon Wildlife Area**.

48.    There is a timing limitation stipulation for this area from December 1 – March 31 to protect big game winter range. This SDA comprises 45,266 acres, of which 27,868 acres

---

[7] BLM letter to Williams dated March 20, 2006.
[8] FFO RMP FEIS at p. N-104.
[9] BLM letter to Energen Resources dated May 4, 2007.
[10] BLM letter to Williams dated March 20, 2006.

contain federal minerals.[11] BLM describes this area as providing significant elk and mule deer habitat, particularly in the winter. Habitat improvements and protection during key stressful times, such as winter, are flagged by the agency as beneficial to these species. The goal for this area is to "Manage to protect wildlife habitat." Seasonal restrictions are provided as the first management prescription in the RMP.[12]

49.     BLM has allowed the seasonal closure to be breached in the Cereza Canyon SDA at least six times since the September 2003 RMP. Burlington asked for approval to build seven well pads and roads in the Cereza SDA in January 2006 and was given approval by BLM three days after its request to build six of the seven. The exception provided was from January 16 – February 24, for a total of 39 days in the middle of the winter.[13]

**Crow Mesa Wildlife Area**.

50.     There is a timing limitation stipulation for this area from December 1 – March 31 to protect big game winter range. This SDA comprises 38,252 acres, of which 34,264 acres contain federal minerals.[14] Crow Mesa is described by BLM as containing resident mule deer and elk populations that are stable or slightly increasing, with the potential for further increase if more habitat improvement and protection can be provided. The goal for this area is to "Manage the Crow Mesa Wildlife Area with a focus on protecting big game and their habitat."  Seasonal restrictions are provided as the first management prescription in the RMP.[15]

51.     BLM has allowed the seasonal closure to be breached in the Crow Mesa SDA at least twice since the September 2003 RMP. This was despite the BLM's recognition that

---

[11] FFO RMP at pp. A-2, B-2 and 2-6 (Table 5).
[12] FFO RMP FEIS at p. N-151.
[13] BLM letter to Burlington dated January 13, 2006.
[14] FFO RMP at pp. B-2 and 2-6 (Table 5), and RMP FEIS at p. N-153.
[15] FFO RMP FEIS at p. N-153.

Crow Mesa is a high priority SDA, "[d]eer and elk make considerable use of this area," and there is "fragmentation of a fairly pervasive nature due to the roads, wells and pipeline infrastructure."[16]

**East La Plata Wildlife Area**.

52.    There is a timing limitation stipulation for this area from December 1 – March 31 to protect big game winter range. This SDA comprises 7,159 acres, of which 5,814 acres contain federal minerals.[17] BLM describes the area as historically receiving heavy winter deer use, but now supporting only 60-100 deer, with the browse in poor condition. The goal for this area is to "Manage the area to protect and preserve big game habitat." Seasonal restrictions are provided as the first management prescription in the RMP.[18]

53.    BLM has allowed the seasonal closure to be breached in the East La Plata SDA at least once since the September 2003 RMP.

**Encinada Mesa-Carrizo Canyon Area of Critical Environmental Concern**.

54.    This SDA comprises 3,490 acres, of which 3,158 acres contain federal minerals.[19] It has a seasonal closure from December 1 – March 31.[20] BLM describes the area as follows: Carrizo Canyon provides yearlong habitat for mule deer and elk. Their numbers are relatively low given the size of the area which is likely due to the amount of habitat fragmentation. Both deer and elk numbers in this area will increase during harsh winters as animals migrate from the

---

[16] BLM letter to Huntington Energy dated March 8, 2006.
[17] FFO RMP at pp. B-2 and 2-6 (Table 5), and RMP FEIS at p. N-155.
[18] FFO RMP FEIS at p. N-155.
[19] FFO RMP at p. A-2, and RMP FEIS at p. N-35.
[20] BLM letter to ConocoPhillips dated November 30, 2006.

higher elevation Jicarilla Ranger District and the Jicarilla Apache reservation to escape the
deeper snow.[21]

55.    BLM has allowed the seasonal closure to be breached at least five times since the
September 2003 RMP.

**Ensenada Mesa Wildlife Area**.

56.    There is a timing limitation stipulation for this area from May 1 – July 15 to
protect antelope fawning range. This SDA comprises 51,280 acres, of which 45,767 acres
contain federal minerals.[22] BLM describes the area as providing critical habitat for the
Farmington Field Office's largest pronghorn herd (approximately 60 animals), with year-long
and seasonal deer and elk use. The agency states that these animals should benefit from
improved habitat conditions. The goal for this area is to "Manage the Ensenada Mesa to protect
and preserve wildlife and their habitat." Seasonal restrictions are provided as the first
management prescription in the RMP.[23]

57.    BLM has allowed this limitation to be breached at least three times since the
September 2003 RMP despite recognizing that the pronghorn population is small and has
struggled for years.[24] As the BLM describes,

>    ...the Ensenada Mesa SDA provides important habitat for a small population of
>    pronghorn antelope. During the fawning period, females disperse widely over the
>    mesa seeking areas of relative solitude in which to give birth.[25]

58.    But that small pronghorn population is not being given a chance, and does are
certainly not enjoying any solitude. BLM estimated that as of November 2003, there were a
staggering 14.2 wells per square mile in Ensenada Mesa SDA and a road density of 3.3 miles per

---

[21] *Id.*
[22] FFO RMP at pp. B-4 and 2-6 (Table 5), and RMP FEIS at p. N-157.
[23] FFO RMP FEIS at p. N-157.
[24] BLM email to A-Plus Well Service dated April 29, 2005.
[25] BLM letter to Enterprise Products dated May 1, 2007.

square mile. A well density of 14.2 wells per square mile means that a well is encountered, on average, every 45 acres.[26]

**Laguna Seca Mesa**.

59.    There is a timing limitation stipulation for this area from December 1 – June 15. This SDA comprises 9,211 acres, of which 8,124 acres contain federal minerals. BLM describes this area as containing deer, elk, Mexican spotted owl, and other wildlife habitat. The agency states that these species would benefit from protection and habitat improvement. The goal for this area is to "Manage the Laguna Seca site to protect and preserve local wildlife and their habitat." Seasonal restrictions are provided as the first management prescription in the RMP.[27]

60.    BLM has allowed the seasonal closure to be breached on Laguna Seca Mesa at least four times since the September 2003 RMP.  BLM describes this SDA as "more heavily and uniformly populated by deer, elk, turkeys and black bear" than other SDAs.[28]  Despite these wildlife values, the agency allowed a month-long breach of the closure from December 1 – 31, 2005.[29]

**Middle Mesa Wildlife Area**.

61.    There is a timing limitation stipulation for this area from December 1 – March 31 to protect big game winter range. This SDA comprises 46,052 acres, of which 40,317 acres contain federal minerals.[30]  BLM describes the area as containing critical deer winter range and notes that deer and elk use patterns suggest that these species may benefit from the area designated as critical winter habitat.

---

[26] *Id.*
[27] FFO RMP FEIS at p. N-161.
[28]  BLM letter to Williams dated November 29, 2005.
[29] *Id.*
[30] FFO RMP at pp. B-2 and 2-6 (Table 5), and RMP FEIS at p. N-163.

62.     Estimates of resident ungulates are 100-150 deer and less than 50 elk.[31] The goal for this area is to "Manage the Middle Mesa Wildlife Area to preserve and protect wildlife and their habitat." Seasonal restrictions are provided as the first management prescription in the RMP.[32]

63.     This SDA is among the most abused when it comes to BLM granting exceptions to seasonal closures. The agency has approved exceptions at least 45 times since the September 2003 RMP. In one instance, BLM approved exceptions from December 11, 2006 – February 28, 2007 in the Middle Mesa SDA, a breach of two and a half months.[33] Many of these were approved en masse on the same day or one day after company requests and are being approved throughout the winter.[34]

**Rattlesnake Canyon**.

64.     There is a timing limitation stipulation for this area from December 1 – March 31 to protect big game winter range. This SDA comprises 110,160 acres, of which 98,276 acres contain federal minerals.[35] BLM describes this area as historically containing many more deer than at present, but states that the goal is to increase these population numbers and those of other wildlife, if it is properly managed. There are approximately 60-70 turkeys in this SDA, 225 deer, and 40-50 elk.[36] The goal is to "Manage Rattlesnake Canyon to support increases in potential wildlife." Seasonal restrictions are provided as the first management prescription in the RMP.[37]

---

[31] BLM letter to ConocoPhillips dated November 30, 2006.
[32] FFO RMP FEIS at p. N-163.
[33] BLM letter to Williams dated December 10, 2006.
[34] E.g., BLM letter to Williams dated March 16, 2007 and BLM letter to ConocoPhillips dated November 30, 2006.
[35] FFO RMP at pp. B-2 and 2-6 (Table 5), and RMP FEIS at p. N-165.
[36] BLM letter to ConocoPhillips dated November 30, 2006.
[37] FFO RMP FEIS at p. N-165.

65.     This SDA is the most abused in terms of numbers of exceptions. BLM has allowed the seasonal closure to be breached in the Rattlesnake SDA at least 97 times since the September 2003 RMP. The agency is clearly working against its stated goal of increasing the wildlife populations in this SDA. In response to a plea by Koch Exploration for five exceptions "[d]ue to the unexpected availability of a drilling rig coming free in Mid April," BLM allowed the company to build roads, wellpads, and cavitate wells from March 19-31, 2007.[38] In another case, an exception was granted to BP America for seismic exploration extending over 19,000 acres within this SDA, from December 1-31, 2005, despite BLM's recognition that "[t]he pervasive nature of the human activity associated with the seismic activity suggests the disturbance and resulting stress to wildlife during this winter period could be detrimental."[39]

**Rosa Mesa Wildlife Area**.

66.     There is a timing limitation stipulation for this area from December 1 – March 31 to protect big game winter range. This SDA comprises 69,762 acres, of which 61,406 acres contain federal minerals. There is also a timing limitation stipulation for 2,500 acres within the Rosa SDA to protect elk calving areas.  That seasonal closure is from December 1 – July 15.[40] BLM describes 1,500 deer using this area, with their distribution influenced by winter severity and human disturbance.

67.     The agency notes that in severe winters, the deer herds migrate south of the protected area and additional protected area is therefore needed. The goal for Rosa Mesa is to "Manage the site to protect and preserve wildlife habitat."  Seasonal restrictions are provided as the first management prescription in the RMP.[41]

---

[38] Koch letter to BLM dated March 2, 2007 and BLM letter to Koch dated March 9, 2007.
[39] BLM letters to BP America dated November 4, 2005 and December 1, 2005.
[40] FFO RMP at pp. B-2 and 2-6 (Table 5), and FEIS at p. N-167.
[41] FFO RMP FEIS at p. N-167.

68.     This SDA is among the most abused in terms of numbers of exceptions.  BLM has allowed the seasonal closure to be violated in the Rosa at least 63 times since the September 2003 RMP, despite its designation as a high priority SDA. The BLM describes the Rosa SDA as "an area of extreme importance to a relatively large number of deer during a critical time of their life cycle,"[42] yet it has allowed the seasonal closure to be breached here every year since the RMP, throughout the crucial winter months. The Rosa is faring poorly: BLM describes the habitat as "in poor condition and barely capable of meeting the forage demands of the migratory deer."[43]

**Thomas Canyon Recreation Area.**

69.     There is a timing limitation for this SDA from November 1 – April 15. The area comprises 15,644 acres, of which 12,775 acres contain federal minerals. BLM describes the area as containing habitat for large herds of wintering mule deer. The agency also states in the RMP, "Natural values within the area are considered important and somewhat rare in an otherwise developed region." The goal is to "Manage the area for the optimal combination of recreational opportunities and wildlife protection." Seasonal restrictions are provided as the second management prescription in the RMP.[44]

70.     BLM has allowed the seasonal closure to be breached in Thomas Canyon at least twice since the September 2003 RMP, despite the agency's designation of it as a high priority SDA and its description that "the Thomas Canyon SDA provides critical deer winter range for migratory deer."[45]

---

[42] E.g, BLM letter to ConocoPhillips dated January 12, 2006.
[43] *Id.*
[44] FFO RMP FEIS at p. N-124.
[45] BLM letter to Pogo Producing dated March 29, 2007.

71.     While BLM designated the above areas as SDAs worthy of special safeguards, its behavior of granting exceptions freely has rendered this status practically meaningless, to the detriment of the natural values these SDAs were established to protect. BLM promised in the RMP to "assist operators in designing plans of development to minimize impacts to oil and gas operations while still meeting wildlife goals."[46] Given the widespread exceptions being granted, there is little evidence the agency has followed through on this pledge.

72.     For all of the above timing limitations, the Farmington Field Office RMP includes the following proviso:

> If circumstances or relative resource values change or if it can be demonstrated that oil and gas operations can be conducted without causing unacceptable impacts, this stipulation may be waived, excepted, or modified by the BLM Authorized Officer, if such action is consistent with the provisions of the Farmington Resource Management Plan, or if not consistent, through a land use plan amendment and associated National Environmental Policy Act analysis document. If the BLM Authorized Officer determines that the waiver, exception, or modification involves an issue of major public concern, the waiver, exception, or modification shall be subject to a 30-day public review period.[47]

73.     Because seasonal closures are now breached as a matter of course, the issue is increasingly controversial and impacting.

## Habitat in the Farmington Field Office

74.     Overall, the key browse species (true mountain mahogany, Wyoming big sagebrush and antelope bitterbrush) throughout much of this area would rate as being in poor condition.  In addition, there are significant areas where the pinyon pine and to a lesser degree Utah juniper have been high-lined by deer that have resorted to eating these trees as starvation foods due to the absence of more desirable forage. Both of these tree

---

[46] FFO RMP at p. 5.
[47] FFO RMP at p.B-2.

species contain significant amounts of secondary metabolites (terpenes) that can cause

abortion when ingested in sufficient quantity.[48]

75.    Poor habitat quality on the Rosa is described by BLM across multiple years:

2004,[49] 2005,[50] 2006,[51] and 2007.[52] In 2003, BLM described these conditions on the Rosa and

Middle Mesa SDAs:

> The browse species in the requested work area are severely degraded.
> Much of the sagebrush, antelope bitterbrush, and true mountain mahogany
> is dead or severely hedged, thus providing little forage to wintering
> animals. Pinyon pine and Utah juniper in this area are often "high-lined"
> by wintering deer. This type of use is indicative of poor habitat conditions
> and inadequate desirable forage.  Wintering deer attempting to avoid the
> human activity associated with the requested exception will find few places
> where they can feel secure.[53]

76.    The BLM has also described bleak conditions in the Carracas SDA:

> …the winter range in the area of the proposed work are [sic] generally
> poor. Much of the desirable browse (I.e., true mountain mahogany,
> antelope bitterbrush and Wyoming big sagebrush) is dead, severely
> hedged or in general exhibits poor vigor…the degree of habitat
> fragmentation from prior natural gas development is extensive. This
> fragmented environment can be more stressful and energetically
> demanding to mule deer depending upon the level of human activity.[54]

77.    In a letter to Duke Energy in response to the company's request for a pipeline to

be excepted, BLM described Rattlesnake Canyon in December 2004 as follows:

> …the area of the proposed actions is highly fragmented. Well density
> averages about 11-12 per square mile and road density is about 1.8 to 3.0
> miles per square mile. In essence, the area can be termed as highly
> fragmented.

---

[48] BLM letter to Devon dated December 22, 2005.
[49] BLM letter to Bill Moss dated November 24, 2004.
[50] BLM letter to Devon dated December 22, 2005.
[51] BLM letter to ConocoPhillips dated December 20, 2006.
[52] BLM letter to Williams dated February 9, 2007.
[53] BLM letter to Williams Field Services (2003).
[54] BLM email to Williams dated November 2, 2005.

78.     Nonetheless, BLM granted Duke a partial exception.[55] At approximately the same time, in a letter to Devon, BLM describes both Rattlesnake Canyon and Middle Mesa SDAs:

> …the area in question has an extensive infrastructure of roads and pipelines leading to numerous gas wells. This has left the landscape highly fragmented. Casual field observations indicate that the animals are concentrated in pockets of quality habitat.[56]

79.     Native ungulates in the Farmington Field Office are increasingly refugees in a hostile landscape, clinging to the few areas with sufficient cover and browse to sustain them during harsh winter months. But neither the habitat loss nor the disturbance is abating, with the result that these refugees can find no refuge.

80.     It is clear from BLM's response to a Burlington request to conduct "emergency" work on two wells that the company's needs come before those of wildlife and that times are tough for ungulates on the Rosa SDA. In a January 2005 letter, BLM allowed an exception for Burlington on San Juan 30-6 Unit #410, but denied the same request on #405. The wells are within five miles of each other and habitat conditions are generally the same. The denial for #405 describes adverse conditions to mule deer that the agency ignored with respect to #410:

> …the potential for human induced stress to these animals is potentially high.  In general 2-3 inches of snow is present on the ground over much of the wooded area. This condition and its effects on wildlife is exacerbated by the excessive road/well network in the area which causes deer and elk to seek refuge (to avoid human interaction) during the daytime in wooded areas where there is deeper snow and the air temperature is colder than the more open sage dominated areas. During the nighttime when the deer and elk move more freely (under the cover of darkness) outside of the wooded areas and into the sage parks the temperature has dropped and thus any opportunity to take advantage of the warmer thermal environment (during the daytime) in the sage parks is lost. This scenario repeated on a daily long-term basis causes physiological stress to deer and elk in that there is an increased caloric demand just to stay warm.…the area surrounding the #405 is highly fragmented. Well densities average about 8 per square mile with road lengths about 2.0 to 2.25 miles per square mile.[57]

---

[55] BLM letter to Duke Energy dated December 20, 2004.
[56] BLM letter to Devon dated December 22, 2004.

BLM has recognized habitat problems across many of the SDAs for years.

<u>BLM Has Approved Numerous Exceptions to Wildlife Closures and Timing Restrictions</u>

81.    In the Farmington Field Office, the high rate of approvals for exceptions – 88.9% – demonstrates that the BLM's default position is to grant exceptions.  <u>See</u> Table 1. Requests are granted throughout the closure period, in high priority wildlife areas, and despite the recognition that such exceptions will disturb area wildlife, which are in serious trouble. Altogether, at least 477 exceptions have been sought to seasonal closures and 425 have been granted.  <u>See</u> Table 1.

82.    This is a significant underestimate, as in some instances, a company request involving multiple actions or sites may be counted as only a single request. In other instances, BLM inexplicably omitted some requests from its database. In addition to the 425 exceptions reported in BLM databases, there are at least an additional 16 exceptions.

83.    BLM has therefore granted approximately 441 exceptions, or more than 110 exceptions per year since the RMP was signed in 2003.

**Table 1. BLM Farmington Field Office Approvals of Wildlife Timing Exceptions. Source: BLM Farmington Field Office 2007.\***

| Year | No. of Requests | No. of Approvals | Approval Rate |
|------|-----------------|------------------|---------------|
| 2003/2004 | 104 | 103** | 99.0% |
| 2004/2005 | 187 | 152 | 81.3% |
| 2005/2006 | 123 | 116 | 95.0% |
| 2006/2007 | 64 | 54 | 84.4% |
| **Totals** | **478** | **425** | **88.9%** |

84.    Most of the seasonal closures in Farmington Field Office run from December 1 – March 31. Exceptions are granted throughout the seasonal closures. While the BLM often

---

[57] BLM letter to Burlington dated January 26, 2005.

justifies granting an exception on the basis that it will occur at the front end of the closure,[58] the

agency also justifies granting exceptions at the back end of the closure,[59] and has granted

exceptions during every month in between.

85.    Disturbance throughout the closure is seen vividly in the series of exceptions

granted within the Rattlesnake Canyon SDA in the winter of 2005/2006. In November 2005,

BLM granted an exception within Rattlesnake Canyon SDA from December 1-23 to Koch to

install surface equipment on four wells in part because "the proposed work will occur on the

'front end' of the closure period before the most severe part of the winter arrives."[60] Additional

exceptions were granted in the same SDA that same winter to Energen to drill a new well from

December 22 – January 31,[61] to the City of Farmington to construct a power line from January 3-

31,[62] to People's Energy to clean and cavitate a well from February 2 – March 6,[63] and again to

Koch to enlarge or construct pads and build roads for three wells from March 20-31,[64] bringing

to an end a seasonal closure with no meaning. As discussed above, the Rattlesnake SDA is

important for deer, elk, and turkey, but these wildlife are given no winter reprieve from

escalating gas production. While the goal in this SDA is to increase wildlife populations, the

Rattlesnake has suffered more exception than any other area – at least 97 – and this goal is

therefore being undermined.

---

[58] For example, BLM letters to Williams dated November 29, 2006 and November 30, 2006, BLM letter to Burlington December 5, 2005, BLM letters to Williams dated November 29, 2005 and December 2, 2005, BLM letter to People's Energy dated December 2, 2005, and BLM letter to the City of Farmington dated December 6, 2005.

[59] Exceptions during March are commonplace. For example, BLM letter to Huntington dated March 8, 2006 (exception from March 6-17 granted in letter, verbal approval by BLM later granted through March 23); BLM letter to ConocoPhillips dated March 8, 2006, which states "the timing of your request comes near the end of the seasonal closure period" and provides an exception to construct roads and wellpads for four wells from March 13-24.

[60] BLM letter to Koch dated November 14, 2005.

[61] BLM letter to Energen dated December 22, 2005.

[62] BLM letter to City of Farmington dated January 3, 2006.

[63] BLM letter to People's Energy dated February 2, 2006.

[64] BLM letter to Koch dated March 14, 2006.

86.    Exceptions vary in length from a few days during the closures to multiple months. For instance, BLM granted an exception in 2005 to Williams from December 1 – February 9 for cavitation of four wells in the Rosa SDA.[65] In 2006, Burlington was allowed an exception from January 16 – February 24 to construct wellpads and roads for six of seven wells in the Cereza Canyon SDA, despite BLM's recognition of serious habitat problems, severely high well densities, and resultant stress on native ungulates in this area:

> The area of the requested exception is being heavily developed for its natural gas reserves. Consequently, the habitat fragmentation that has resulted from imposing this type of infrastructure on the landscape is high. In November of 2003 the number of gas wells located within the Cereza Canyon SDA was 571 or approximately 12.4 wells per square mile of land. Road densities at his time were calculated at approximately 3.7 miles of road per square mile. Since this time there has been considerably more development. Clearly, this magnitude of fragmentation impacts the ability of big game such as deer and elk to readily escape the possible stressful effects of human activity.[66]

87.    Well density of 12.4 per square mile means a well is encountered on average every 52 acres. This level of development is even more concerning when considering BLM's management goal for this area: "to protect wildlife habitat," and its characterization of Cereza Canyon as providing significant elk and mule deer habitat, particularly in the winter, a particularly stressful time for these animals.[67]

88.    The disturbance that occurs during what are supposed to be quiet winter months in the field is sometimes acknowledged in passing by BLM. For instance, on December 7, 2004, a week into the winter closure, BLM wrote to McElvain Oil and Gas that "there is considerable human disturbance" in the Rattlesnake Canyon SDA. BLM nonetheless approved the company's request to continue that disturbance until December 30. The company's reason for the request:

---

[65] BLM letter to Williams dated November 16, 2005. This was the second letter to Williams on the same day, as discussed later in the report.
[66] BLM letter to Burlington dated January 12, 2006.
[67] FFO RMP FEIS at p. N-151.

the rig schedule.[68] Indeed, wildlife exemptions for mule deer and elk are often requested on the basis that when a company has a drill rig, it has to keep it working. The rig schedule has become a paramount driver in oil and gas operations on BLM lands, overriding the needs of the land or wildlife.

89.    Requests for multiple exceptions at once occur quite frequently. On October 21, 2004 Williams requested exceptions to drill 14 wells with 24-hour rigs on the Middle Mesa and Rosa SDAs. Rather than requiring Williams to finish drilling in the more than five weeks before the December closure began, BLM granted approval for the Middle Mesa wells to be drilled and told the company that the Rosa wells could be assessed in late November.[69]  On December 2, 2005, BLM granted ConocoPhillips an exception through December 15 for at least 24 activities occurring in the Rosa, Middle Mesa, Rattlesnake Canyon, and Laguna Seca SDAs. This was despite recognition that key browse species were "severely degraded," mule deer numbers were very high: numbering at least 800-1,000 animals, habitat fragmentation was severe, and a late season (December 3-7) elk hunt with 300 hunters would add more stress. While BLM noted that, "The stress to elk and deer in the area may be significant from having to contend with the industry activity and hunters," their concern was not great enough to turn the company down.[70] The mule deer and elk were thus denied any buffer from the severe, intersecting threats they faced that winter. With no incentive to plan better, ConocoPhillips again requested many exceptions the following winter. On November 30, 2006, BLM granted ConocoPhillips exceptions for at least 23 activities occurring in the Rosa, Carrizo Canyon, Rattlesnake Canyon, and Middle Mesa SDAs. BLM approved the exceptions despite recognizing significant troubles

---

[68] Email correspondence between BLM and McElvain Oil and Gas Properties, dated December 6-7, 2004.

[69] BLM letter to Williams dated November 1, 2004.
[70] BLM letter to ConocoPhillips dated December 2, 2005.

for the wintering deer, given that habitat on the Rosa was "in poor condition and barely capable of meeting the forage demands of the migratory deer."[71] BLM also noted a high level of fragmentation, at least 6.3-12.4 wells per square mile and 2.0-3.7 miles of road per square mile, across all of these areas and stated,

> Clearly, this magnitude of fragmentation does not lend itself to enabling large mammals such as deer and elk to readily escape the possible stressful effects of widespread human activity which already routinely occurs in the Rosa SDA.[72]

Nevertheless, BLM used its "rubberstamp," taking only three days to approve this sweeping set of exceptions.[73]

90.    Exceptions are also being granted across large acreages. For example, in November 2005, BLM approved a two-week breach from December 1-15 to BP for a seismic exploration project in Rattlesnake Canyon SDA impacting 19,000 acres.[74] This was despite recognizing that: "The pervasive nature of the human activity associated with the seismic activity suggests the disturbance and resulting stress to wildlife during this winter period could be detrimental." In addition, BLM wrote in its analysis that:

> In November of 2003 the number of gas wells located within the Rattlesnake Canyon SDA was 1,079 or approximately 6.3 wells per square mile of land. Road densities at this time were calculated at approximately 2.3 miles of road per square mile. Since this time there has been considerably more development. Clearly, this magnitude of fragmentation does not lend itself to enabling large mammals such as deer and elk to readily escape the possible stressful effects of widespread activity such as seismic exploration.[75]

91.    The BLM took only three days to approve this exemption despite its extensive impacts and despite the closure being a month away.[76]

---

[71] BLM letter to ConocoPhillips dated November 30, 2006.

[72] *Id.* Estimates of well and road densities were from November 2003 and were therefore likely to have been greater by November 2006.

[73] *Id.* ConocoPhillips' requests were dated November 27, 2006.

[74] The company had requested a six-week exception, but the BLM provided only partial approval.

[75] BLM letter to BP dated November 4, 2005.

92.    While the BLM sometimes denies companies' requests for exception, a denial is rare, as seen from the overall exception approval rate of approximately 89%. In November 2005, the agency showed just how unwilling it is to stand up for the area's wildlife in the face of industry requests that mitigations be swept aside. On November 16, while BLM initially denied a request for an exception requested by Williams to cavitate four wells in the Rosa SDA, the agency reversed itself on the very same day.[77] The original BLM letter to Williams stated that the Rosa SDA "provides critical deer winter range for large numbers of migratory deer" and described high deer densities, noted the long length of the request (from December 1 – February 9), acknowledged the poor habitat conditions, and therefore denied the request, stating:

> …from a cumulative perspective it does not seem prudent to authorize additional human activity in an area that is heavily used by wintering deer. Given these circumstances it is my decision to deny your request for an exception to the seasonal restriction in the Rosa Mesa SDA.[78]

Seasonal Closures Are Waived Through a Private Process

93.    In the Farmington Field Office, BLM often grants exceptions to wildlife closures within a day of an oil and gas company's request. The exception guidance states that the intent is to grant exceptions within 1-3 days of receipt.[79] The requests take the form of an email, letter, or phone call, and approval is provided by BLM in the same fashion. In some cases, approval is nearly instantaneous.

94.    The exceptions are granted through an entirely private process. The exceptions to seasonal closures in the Farmington Field Office are based on a November 2003 guidance

---

[76] *Id.*

[77] BLM letter to Williams dated November 16, 2005 and a second BLM letter the same day.

[78] *Id.* See original BLM letter to Williams.

[79] Bureau of Land Management. 2003. Procedures for requesting an exception to seasonal drilling restrictions. Farmington Field Office document dated November 2003. See unnumbered p. 5.

document that was issued several months after the RMP was approved.[80] While the RMP stated

that exception criteria would be produced "in collaboration with industry, the New Mexico

Department of Game and Fish and other interested parties,"[81] the guidance and subsequent

applications of it have never been subject to NEPA review or public comment.  The RMP ROD

also stated that if the BLM Authorized Officer determines that the waiver, exception, or

modification involves an issue of major public concern, the waiver, exception, or modification

shall be subject to a 30-day public review period.[82]

     95.    There is major public concern regarding BLM's granting of waivers and

exceptions to the wildlife closures and time restrictions.  For example, in December, 2007,

Plaintiff released a report documenting Defendants systemic granting of exceptions to the

wildlife closures and timing restrictions.  On December 22, 2007, Defendant Linda Rundell

responded to Plaintiff's report with an opinion editorial in the Alburquerque Journal.  On January

5, 2008, Plaintiff's Wildlife Program Director responded with another opinion editorial in the

Alburquerque Journal.  Then, on January 10, 2008, the New Mexico Department of Game and

Fish wrote a letter to the BLM state director Linda Rundell.  In the letter, the New Mexico

Department of Game and Fish stated:

> The Department of Game and Fish (Department) and State Game Commission are
> becoming increasingly concerned with recent assertions regarding the number and
> frequency of exceptions to wildlife protective restrictions that are being approved
> by the Farmington Field Office.

January 10, 2008 Letter from Bruce Thompson to Linda Rundell at page 1.

---

[80] *Id.*
[81] FFO RMP at p. 5.
[82] Farmington Field Office ROD page B-3

96.    The process leading to the November 2003 exception guidelines involved a committee hand-picked by BLM.  BLM stated that, "the process to develop the criteria hinged upon the collective efforts of a committee representing all perceived stakeholders that was assembled somewhat informally by the BLM."[83] It appears that only one meeting was held to develop this guidance, on the afternoon of October 29, 2003. It was attended by eleven individuals, the majority of which were affiliated with industry or government agencies. No notices were released by the BLM alerting the public about this meeting.[84]  But the minutes of the meeting revealed a serious problem: most of the SDAs overlaid "focused areas of well development" during the next 3-5 years, according to industry representatives. These representatives also indicated that SDAs would impact the majority of oil and gas companies operating in the area, but some companies would be affected more than others. For example, 90% of ConocoPhillips' development over the next 3 years was planned within SDAs with wildlife seasonal closures.[85]  Indeed, ConocoPhillips has received more exceptions to seasonal closures than any other company in the Farmington Field Office since the RMP was adopted. Despite the intense activity foreseen in key wildlife habitats and the consequent need for seasonal closures, BLM and its hand-picked committee effectively lifted the closures before they ever began.

97.    As noted above, the pressure for exceptions often comes down to the rig schedule. With its obliging responses to company requests, the BLM has become a vehicle to ensure maximum profit margins for the oil and gas industry.  A representative of BP stated: "We will suffer significant economic and operational consequences if BP should be required to halt operations. At this time of record natural gas prices and limited rig availability, *any cessation in*

---

[83] BLM email to Forest Guardians dated November 26, 2007.
[84] *Id.*
[85] *Id.*

*activity* has serious impacts on cash flow and hinders our efforts to keep quality rigs working for

BP."[86] Similarly, a representative of Devon Energy Corporation stated, "Should Devon be

required to halt operations [due to the closure], we will suffer significant economic and

operational consequences. At this time of record natural gas prices and limited rig availability,

*any cessation in activity* has serious impacts on cash flow and hinders our efforts to keep quality

rigs working for Devon."[87] Another example comes from an XTO employee, who stated, "I am

requesting an early start because XTO has a drilling rig suited for drilling this type of well under

contract at this time. We are scheduled to lose this rig on or near April 1st, 2006."[88]

  98.  Burlington took it one step further, asking in a November 9, 2004 letter for an

exception for *all of its rigs* until December 15, 2004. The company asserted that:

> Burlington has made an honest effort to plan its drilling rigs around the
> wintering/non-wintering guidelines outlined in the BLM's RMP. Since the
> 1st of September we have had to drill nine non-wintering wells, since the
> APD approvals for our wintering wells came much slower than we anticipated.
> You can see the dilemma this situation has put us in. We are trying to maintain
> activity for five drilling rigs and when coal wells are spud every four days and
> MV/DK [Mesaverde/Dakota formations] wells every 10 days we need to receive
> approx. 5-6 APDs a week to keep up. Since these nine non-wintering wells have
> already been spud during this time period there is a good possibility that we are
> looking at running out of non-wintering wells to spud before April 1st…
> We appreciate the fact that we have received seven APD approvals for wintering
> wells in the last week. There are also three wells that we don't have approval for
> yet, but have been promised by the Surface group that they will be coming within
> the week…
> Using these 10 wells with the other wintering wells we have, we are still short…
> Saying all of this, we are requesting an exception for all of our rigs until
> December 15th…
> Also since we had to use nine of our non-wintering wells to keep the rig busy this
> fall, we may have to request wintering exceptions on the backside of the closure
> period, if weather permits. This will only be if we don't have enough non-

---

[86] BP letter to BLM dated November 3, 2004. Emphasis added.

[87] Devon letter to BLM dated November 1, 2004. Emphasis added. Note the identical language used in the Devon and BP letters.

[88] XTO letter to BLM dated March 2, 2006.

wintering wells to keep the rigs busy and all we have permitted are wintering wells.[89]

99.    As if it was BLM's job to keep Burlington's rigs busy, within a week, the agency granted exceptions for 15 of 19 Burlington wells through December 15, 2005. Burlington requested an additional exception on 18 of these wells and two pipelines on December 13, which BLM granted within three days, allowing Burlington until December 24 to complete its new wells and pipelines.[90]

100.    The following spring, Burlington requested an exception to drill one of three wells during the last week of March, stating: "We are having a hard time keeping our cavitation rigs busy."[91] BLM granted verbal approval the same day and responded via email within twenty-four hours, approving the drilling of all three wells for the two weeks remaining in the closure period (through March 31).[92]

101.    This approval process between BLM and industry not only results in shutting the public out when promised mitigations are being reneged upon, it also prevents agency accountability.

102.    For instance, exceptions were granted to Williams for cavitation of seven wells in December 2003 but BLM lost the notes from the meeting where approval was given.[93] Similarly, in November 2004, Devon requested exceptions for 42 actions but BLM lost the company's original request.[94] Without adequate documentation of the disturbance being allowed to occur during seasonal closures, the agency will not be able to fully assess the harm caused to wildlife that are supposed to be benefiting from those closures.

---

[89] Burlington letter to BLM dated November 9, 2004.
[90] BLM letter to Burlington dated December 16, 2004.
[91] Burlington email to BLM dated March 16, 2005.
[92] BLM email to Burlington dated March 17, 2005.
[93] BLM letter to Forest Guardians dated October 5, 2007.
[94] *Id.*

## II.   BLM'S MARCH 8, 2006 EXCEPTION

103.   On March 8, 2006, BLM granted ConocoPhillips an exception to the seasonal restrictions on drilling and other human disturbances within the Rosa Mesa Wildlife Specially Designated Area (SDA).  In its November 2003 Procedures for Requesting An Exception to Seasonal Drilling Restrictions, BLM designated the Rosa Mesa Wildlife SDA as a high priority area.   BLM explained: "The rationale in making this determination is based upon the fact that the Rosa SDA provides critical deer winter range for large numbers of migratory deer."

104.   BLM claimed the High Priority Designation meant that the Rosa Mesa Wildlife SDA was an area where BLM was least likely to grant an exception to the seasonal restrictions on drilling and other human disturbance activities related to oil and gas extraction.

105.   The requested activity is was to construct well pads and roads for four gas wells. The work was to take place from March 13, 2006 through March 24, 2006.

106.   BLM stated: "In general, the Rosa SDA is characterized as having "high" deer densities."  BLM's November 2003 Procedures state: "Moderate to high densities would generally be incompatible with increased human activity during the winter."

107.   BLM also acknowledged that deer and other wildlife in this area where already facing difficult winter conditions because of poor habitat.  BLM stated:

> Overall, the key browse species (true mountain mahogany, Wyoming big sagebrush and antelope bitterbrush) throughout much of the Rosa SDA would rate as being in poor condition.  In addition, there are significant areas where the pinyon pine and to a lesser degree Utah juniper have been high-lined by deer that have resorted to eating these trees as starvation foods due to the absence of more desirable forage.  Both of these tree species contain significant amounts of secondary metabolites (terpenes) that can cause abortion when ingested in sufficient quantity.
>
> . . .

The area of the requested exception is being heavily developed for its natural gas reserves. Consequently, the habitat fragmentation that has resulted from imposing this type of infrastructure on the landscape is high. In November of 2003 the number of gas wells located within the Rosa SDA was 938 or approximately 7.9 wells per square mile of land. Road densities at this time were calculated at approximately 2.0 miles of road per square mile. Clearly, this magnitude of fragmentation does not lend itself to enabling large mammals such as deer and elk to readily escape the possible stressful effects of widespread human activity which already routinely occurs in the Rosa SDA.

108.    Yet, BLM granted ConocoPhillips request for an exception.

109.    BLM did not conduct any NEPA analysis specific to the decision to grant this exception.

110.    BLM did not provide any public notice of ConocoPhillips' request for this exception, BLM's consideration of the request or BLM's decision to grant the request.

## III.    BLM'S NOVEMBER 30, 2006 EXCEPTION

111.    On November 30, 2006, BLM granted ConocoPhillips an exception to the seasonal restrictions on drilling and other human disturbances within the Rosa Mesa, Rattlesnake Canyon, Carrizo Canyon, and Middle Mesa Specially Designated Areas (SDA). BLM has actually designated Carrizo Canyon as an Area of Critical Environmental Concern. BLM designated the Rosa Mesa Wildlife SDA as a high priority area and the Rattlesnake Canyon, Carrizo and Middle Mesa SDAs as moderate priority. BLM explained: "The rationale in making these determinations is based upon the fact that the Rosa SDA provides critical deer winter range for large numbers of migratory deer and the other SDAs provides yearlong habitat to a smaller number of resident deer and elk."

112.    BLM claimed the High Priority Designation meant that the Rosa Mesa Wildlife SDA was an area where BLM was least likely to grant an exception to the seasonal restrictions on drilling and other human disturbance activities related to oil and gas extraction.

36

113.    ConocoPhillips requested an exception to conduct 23 activities.  They were:

| ACTIVITY | DURATION | LOCATION | WILDLIFE SDA | PRIORITY |
|---|---|---|---|---|
| Well connection | 12/11/06 | SJ30-5 #38M; 30-5-18 SWSE | Rosa | High |
| Well re-stimulation | 12/7/06 | SJ 30-6 #463S; 30-7-13 NESE | Rosa | High |
| Well re-stimulation | 12/15/06 | SJ 30-6 #450S; 30-6-7 SENW | Rosa | High |
| Compressor Set | 12/15/06 | SJ 31-6 #233; 31-6-29 NE ¼ | Rosa | High |
| Well re-stimulation | 12/15/06 | SJ 30-6 #491; 30-6-25 SWSW | Rosa | High |
| Pipeline Connect 109' | 12/15/06 | 31-6-29 SE 1/4 | Rosa | High |
| Pipeline Connect 841' | 12/15/06 | SJ 32-7 #247; 32-7-7 | Rattlesnake Canyon | Moderate |
| Compressor Set | 12/15/06 | SJ 32-8 #229A; 32-8-20 NW ¼ | Rattlesnake Canyon | Moderate |
| Compressor Set | 12/15/06 | SJ 32-8 #257; 32-8-19 NE 1/4 | Rattlesnake Canyon | Moderate |
| Plug/Abandon well | 5/5/06 | SJ 28-6 #66; 27-6 11 NWNE | Carrizo Canyon | Moderate |
| Install electronic end devices | Year-long | Numerous (2,600) | varies | varies |
| Well connection | 12/6/06 | SJ 32-7 #202A; 32-7-18 SENW | Middle Mesa | Moderate |
| Well connection | 12/8/06 | SJ 32-8 #34; 31-8-22 NWSE | Rattlesnake Canyon | Moderate |
| Well connection | 12/8/06 | SJ32-7 #69M; 32-7-35 SENW | Middle Mesa | Moderate |
| Well re-stimulation | 12/10/06 | SJ 32-8 #207A; 31-8-21 | Rattlesnake Canyon | Moderate |
| Well connection | 12/8/06 | SJ#31-6 #49G; 30-6-5 NWSE | Middle Mesa | Moderate |
| Well connection | 12/11/06 | SJ32-7 #44G;32-7-22 SWSE | Middle Mesa | Moderate |
| Well connection | 12/11/06 | SJ32-8 # 12F; 31-8-21 NESW | Rattlesnake Canyon | Moderate |
| Well connection | 12/08/06 | SJ32-9 #285S; 32-10-13 SENW | Rattlesnake Canyon | Moderate |
| Well connection | 12/04/06 | SJ27-5 #116N; 27-5-24 NWNW | Carrizo Canyon | Moderate |
| Well connection | 12/04/06 | SJ27-5 #96P; 27-5-15 SWNW | Carrizo Canyon | Moderate |
| Well connection | 12/08/06 | Wilmer Can #102; 32-8-24 NENW | Rattlesnake Canyon | Moderate |
| Retrieve fishing tool | 12/05/06 | 32-7-69M; 32-7-35 SENW | Middle Mesa | Moderate |

114.    BLM stated: "In general, the Rosa SDA is characterized as having "high" deer densities."  BLM's November 2003 Procedures state: "Moderate to high densities would generally be incompatible with increased human activity during the winter."

115.    BLM also acknowledged that deer and other wildlife in this area where already facing difficult winter conditions because of poor habitat.  BLM stated:

> Overall, the key browse species (true mountain mahogany, Wyoming big sagebrush and antelope bitterbrush) throughout much of the Rosa SDA would rate as being in poor condition.  In addition, there are significant areas where the pinyon pine and to a lesser degree Utah juniper have been high-lined by deer that have resorted to eating these trees as starvation foods due to the absence of more desirable forage.  Both of these tree species contain significant amounts of secondary metabolites (terpenes) that can cause abortion when ingested in sufficient quantity. . . .

The area of the requested exception is being heavily developed for its natural gas reserves. Consequently, the habitat fragmentation that has resulted from imposing this type of infrastructure on the landscape is high.

116.    Yet, BLM granted ConocoPhillips request for an exception.

117.    BLM did not conduct any NEPA analysis specific to the decision to grant this

exception.

118.    BLM did not provide any public notice of ConocoPhillips' request for this

exception, BLM's consideration of the request or BLM's decision to grant the request.

## IV.    PROCEDURAL BACKGROUND

119.    On May 18, 2001, President Bush issued Executive Order 13212 requiring

BLM and other federal agencies to take "Actions to Expedite Energy-Related Projects."

The Executive Order set up a Task Force for Streamlining Energy Permitting. 66 Fed.

Reg. 28357 (May 18, 2001). In November 2001, BLM established a National Energy

Office. BLM identified over forty tasks representing "opportunities to expedite or

expand energy supplies" from public lands.

120.    In September, 2003 BLM issued a Record of Decisions for the Farmington

Resource Management Plan and Final Environmental Impact Statement. Importantly, the Final

Environmental Impact Statement and Resource Management Plan are general documents and do

not evaluate any site-specific impacts of any project. The Record of Decision provides:

> Ground disturbing activities associated with decisions made in this RMP are still
> subject to environmental and administrative reviews according to applicable
> federal regulations. The Farmington Field Office will use this RMP as the
> framework for pursuing collaborative management of natural resources on public
> lands in the San Juan Basin.

121.    The Final Environmental Impact Statement and Proposed Resource Management
Plan project that there would be approximately 10,000 new oil and gas wells in the Farmington
Field Office between 2003 and 2023.

122.    After BLM issued the Final Environmental Impact Statement, in November 2003,
BLM issued its Procedures for Requesting An Exception to Seasonal Drilling Restrictions.  BLM
did not provide public notice of its drafting or release of the Procedures for Requesting An
Exception to Seasonal Drilling Restrictions.   BLM did not conduct any NEPA analysis of the
Procedures for Requesting An Exception to Seasonal Drilling Restrictions.

123.    In June 2005, the Government Accountability Office ("GAO") issued a report
finding that the increased volume of applications for permits to drill and mandates to
process them promptly resulted in more BLM staff resources being devoted to issuing
permits and less to monitoring and enforcing compliance with environmental standards.
GAO's report is available at: http://www.gao.gov/new.items/d05418.pdf.

## CLAIM FOR RELIEF

### FIRST CLAIM FOR RELIEF

(FAILURE TO CONDUCT ANY NEPA ANALYSIS ON MARCH 8, 2006 EXCEPTION TO
SEASONAL CLOSURE)

124.    Each allegation set forth in the Complaint is incorporated herein by reference.

125.    Defendants' March 8, 2006 granting of an exception to the seasonal closure,
described above, is a major federal action within the meaning of NEPA, 42 U.S.C. §§ 4321 *et
seq.*, and its implementing regulations.  40 C.F.R. §§ 1500 *et seq.*.  Defendants' March 8, 2006
granting of an exception to the seasonal closure is an "[a]pproval of specific projects, such as

construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision[.].

126.    Defendants' March 8, 2006 granting of an exception to the seasonal closure, described above, will significantly affect the quality of the human environment within the meaning of NEPA and its implementing regulations.

127.    Defendants did not prepare an EIS before granting the March 8, 2006 exception to the seasonal closure, described above, in violation of NEPA.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.5, 1508.3.

128.    In the alternative, the Defendants did not prepare an EA and issue a FONSI before failing to prepare an EIS for their March 8, 2006 granting of an exception to the seasonal closure, described above, in violation of NEPA.  40 C.F.R. §§ 1501.3, 1501.4, 1508.9.

129.    The Defendants failed to identify the purpose and need for their March 8, 2006 granting of an exception to the seasonal closure, described above, failed to describe the affected environment, and the impacts of their proposed action in a public EA or EIS before granting the March 8, 2006 exception to the seasonal closure, described above, in violation of NEPA.  40 C.F.R. §§ 1502.10(d); 1502.13, 1502.15.

130.    Defendants failed to consider any reasonable alternatives to their proposed action before granting the March 8, 2006 exception to the seasonal closure, described above, in violation of NEPA.  42 U.S.C. § 4332(2)(c)(iii); 40 C.F.R. § 1502.14(a).

131.    Defendants failed to look at any mitigation measures that would reduce the environmental consequences of their proposed action and thereby support an EA and FONSI before granting the March 8, 2006 exception to the seasonal closure, described above, in violation of NEPA.  40 C.F.R. §§ 1508.25(b); 1502.14(f); 1502. 6(h); 1505.2(c).

132.    Defendants failed to perform any analysis of the cumulative effects of their March 8, 2006 granting of an exception to the seasonal closure, described above, and evaluate the environmental consequences of these cumulative actions, in violation of NEPA.  40 C.F.R. §§ 1508.25(c)(3); 1508.7.

133.    Defendants failed to provide any public notice and failed to provide any opportunity for public comment before granting the March 8, 2006 exception to the seasonal closure, described above, in violation of NEPA.

134.    Defendants' actions in failing to comply with NEPA and its implementing regulations are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 701 *et seq.*, and are subject to judicial review thereunder.

## SECOND CLAIM FOR RELIEF

### (FAILURE TO CONDUCT ANY NEPA ANALYSIS ON NOVEMBER 30, 2006 EXCEPTION TO SEASONAL CLOSURE)

135.    Each allegation set forth in the Complaint is incorporated herein by reference.

136.    Defendants' November 30, 2006 granting of an exception to the seasonal closure, described above, is a major federal action within the meaning of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations.  40 C.F.R. §§ 1500 *et seq.*.  Defendants' November 30, 2006 granting of an exception to the seasonal closure is an "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision[.].

137.    Defendants' November 30, 2006 granting of an exception to the seasonal closure, described above, will significantly affect the quality of the human environment within the meaning of NEPA and its implementing regulations.

138.    Defendants did not prepare an EIS before granting the November 30, 2006 exception to the seasonal closure, described above, in violation of NEPA.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.5, 1508.3.

139.    In the alternative, the Defendants did not prepare an EA and issue a FONSI before failing to prepare an EIS for their November 30, 2006 granting of an exception to the seasonal closure, described above, in violation of NEPA.  40 C.F.R. §§ 1501.3, 1501.4, 1508.9.

140.    The Defendants failed to identify the purpose and need for their November 30, 2006 granting of an exception to the seasonal closure, described above, failed to describe the affected environment, and the impacts of their proposed action in a public EA or EIS before granting the November 30, 2006 exception to the seasonal closure, described above, in violation of NEPA.  40 C.F.R. §§ 1502.10(d); 1502.13, 1502.15.

141.    Defendants failed to consider any reasonable alternatives to their proposed action before granting the November 30, 2006 exception to the seasonal closure, described above, in violation of NEPA.  42 U.S.C. § 4332(2)(c)(iii); 40 C.F.R. § 1502.14(a).

142.    Defendants failed to look at any mitigation measures that would reduce the environmental consequences of their proposed action and thereby support an EA and FONSI before granting the November 30, 2006 exception to the seasonal closure, described above, in violation of NEPA.  40 C.F.R. §§ 1508.25(b); 1502.14(f); 1502. 6(h); 1505.2(c).

143.    Defendants failed to perform any analysis of the cumulative effects of their November 30, 2006 granting of an exception to the seasonal closure, described above, and evaluate the environmental consequences of these cumulative actions, in violation of NEPA.  40 C.F.R. §§ 1508.25(c)(3); 1508.7.

144.    Defendants failed to provide any public notice and failed to provide any opportunity for public comment before granting the November 30, 2006 exception to the seasonal closure, described above, in violation of NEPA.

145.    Defendants' actions in failing to comply with NEPA and its implementing regulations are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 701 *et seq.*, and are subject to judicial review thereunder.

## THIRD CLAIM FOR RELIEF

### (FAILURE TO CONDUCT ANY NEPA ANALYSIS ON NOVEMBER 2003 PROCEDURES FOR REQUESTING AN EXCEPTION TO SEASONAL DRILLING RESTRICTIONS)

146.    Each allegation set forth in the Complaint is incorporated herein by reference.

147.    The Defendants' November 2003 Procedures For Requesting An Exception to Seasonal Drilling Restrictions ("2003 Procedures"), described above, is a major federal action within the meaning of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations.  40 C.F.R. §§ 1500 *et seq.*.  Defendants' 2003 Procedures is a formal document establishing their policies and will substantially alter agency programs.  The 2003 Procedures is a formal plan which will guide the use of federal resources.  40 C.F.R. §§ 1508.18(b)(1) & (2).

148.    Defendants' 2003 Procedures will significantly affect the quality of the human environment within the meaning of NEPA and its implementing regulations.

149.    The Defendants did not prepare an EIS before adopting their 2003 Procedures in violation of NEPA.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.5, 1508.3.

150.    In the alternative, the Defendants did not prepare an EA and issue a FONSI before failing to prepare an EIS for their 2003 Procedures in violation of NEPA.  40 C.F.R. §§ 1501.3, 1501.4, 1508.9.

151.    The Defendants failed to identify the purpose and need for their 2003 Procedures, failed to describe the affected environment, and the impacts of their proposed action in a public EA or EIS before adopting their 2003 Procedures in violation of NEPA.  40 C.F.R. §§ 1502.10(d); 1502.13, 1502.15.

152.    Defendants failed to consider any reasonable alternatives to their proposed action before preparing their 2003 Procedures in violation of NEPA.  42 U.S.C. § 4332(2)(c)(iii); 40 C.F.R. § 1502.14(a).

153.    Defendants failed to look at any mitigation measures that would reduce the environmental consequences of their proposed action and thereby support an EA and FONSI before adopting their 2003 Procedures in violation of NEPA.  40 C.F.R. §§ 1508.25(b); 1502.14(f); 1502. 6(h); 1505.2(c).

154.    Defendants failed to perform any analysis of the cumulative effects of their 2003 Procedures and evaluate the environmental consequences of these cumulative actions, including the effects of the separate actions contemplated under the 2003 Procedures before adopting the 2003 Procedures in violation of NEPA.  40 C.F.R. §§ 1508.25(c)(3); 1508.7.

155.    Defendants failed to provide any public notice and failed to provide any opportunity for public comment before adopting their 2003 Procedures in violation of NEPA.

156.    Defendants' actions in failing to comply with NEPA and its implementing regulations are arbitrary, capricious, an abuse of discretion and contrary to law in violation of the APA, 5 U.S.C. §§ 701 *et seq.*, and are subject to judicial review thereunder.

**FOURTH CLAIM FOR RELIEF**

**(FAILURE TO PROVIDE FOR PUBLIC PARTICIPATION IN GRANTING OF THE MARCH 8, 2006 AND NOVEMBER 30, 2006 EXCPETIONS IN VIOLATION OF FLMPA)**

157.    Each allegation set forth in the Complaint is incorporated herein by reference.

158**.** Section 309(f) of FLPMA directs the Secretary to provide for public participation in "the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1739(e). Emphasizing the significance of the phrase "and the management of," the D.C. Circuit has held that BLM must provide public participation in individual management decisions related to the public lands and not simply in the development of land use plans. NWF v. Burford, 835 F.2d 305, 322 (D.C. Cir. 1987).

159. Farmington Field Office ROD page B-3 provides:

If the BLM Authorized Officer determines that the waiver, exception, or modification involves an issue of major public concern, the waiver, exception, or modification shall be subject to a 30-day public review period.

160. Defendants did not provide for public participation or a public review period for the granting of the March 8, 2006 and November 30, 2006 exceptions described above.

161. This was a violation of FLPMA.

## FIFTH CLAIM FOR RELIEF

(FAILURE TO SUPPLEMENT THE FARMINGTON RESOURCE MANAGEMENT PLANT ENVIRONMENTAL IMPACT STATEMENT)

162. Each allegation set forth in the Complaint is incorporated herein by reference.

163. Since issuing the Final Environmental Impact Statement in September 2003, Defendants have granted over 441 exceptions to seasonal closures in specially designated areas including high priority specially designated areas.

164. Between 2003 and Spring of 2007, Defendants granted exceptions to seasonal closures approximately 89% of the time oil and gas companies requested exceptions.

165. This is significant new information that was not considered in the Final Environmental Impact Statement.

166.    This represents a substantial change to the actions proposed in the Final Environmental Impact Statement.

167.    Defendants have not supplemented the Final Environmental Impact Statement to consider this information.

168.    Defendants' failure to supplement their Final Environmental Impact Statement is a violation of NEPA.  40 C.F.R. § 1502.9(c).

## PRAYER FOR RELIEF

WHEREFORE, Guardians requests that this Court enter judgment providing the following relief:

A.    A declaration that the Defendants have violated NEPA and FLMPA by failing to conduct NEPA analyses and allow for public participation for the March 8, 2006 and November 30, 2006 exceptions and the November 2003 Procedures For Requesting an Exception to Seasonal Drilling Restrictions and by failing to prepare a Supplemental Environmental Impact Statement regarding the granting of exceptions to seasonal drilling restrictions in specially designated areas since issuing the September 2003 Final Environmental Impact Statement;

B.    An injunction compelling the Defendants to conduct NEPA analyses and allow for public participation for the March 8, 2006 and November 30, 2006 exceptions and the November 2003 Procedures For Requesting an Exception to Seasonal Drilling Restrictions and to prepare a Supplemental Environmental Impact Statement regarding the granting of exceptions to seasonal drilling restrictions in specially designated areas since issuing the September 2003 Final Environmental Impact Statement;

C.     An order awarding Guardians its costs of litigation, including reasonable

attorneys' fees;

D.     Such other and further relief as the Court deems just and proper.


Respectfully submitted,


s/ Robert Ukeiley
Staff Attorney,
WildEarth Guardians
1536 Wynkoop Street, Suite 300
Denver, CO 80202
Tel: (720) 563-9306
Fax: (866) 618-1017
E-Mail: rukeiley@wildearthguardians.org

Dated: May 9, 2008

C
08-802
ESH

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| WILDEARTH GUARDIANS | U.S. Bureau of Land Management, et al., |

| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    88888 | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT |
|---|---|
| (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) |
| | NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | AT |
|---|---|
| Robert Ukeiley | Case: 1:08-cv-00802 |
| WildEarth Guardians | Assigned To : Huvelle, Ellen S. |
| 1536 Wynkoop Street, Ste 300 Denver, CO 80202 | Assign. Date : 5/9/2008 |
| 720-563-9306 | Description: Admin Agency Review |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ⊙ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ⊙ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☒ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)*    OR    ○ F. *Pro Se General Civil* |
|---|

| **Real Property** | **Bankruptcy** | **Forfeiture/Penalty** | |
|---|---|---|---|
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| **Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant)<br>☐ 871 IRS-Third Party 26 USC 7609 | **Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

6

| G. *Habeas Corpus/* $2255 | H. *Employment Discrimination* | I. *FOIA/PRIVACY ACT* | J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

5 U.S.C. §§ 701-706, 42 U.S.C. § 4321 Defendants violated the Administrative Procedure Act by failing to comply with NEPA

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23    DEMAND $ N/A    Check YES only if demanded in complaint<br>**JURY DEMAND:**    YES ☐    NO ☒

**VIII. RELATED CASE(S) IF ANY**    (See instruction)    YES ☐    NO ☒    If yes, please complete related case form.

DATE _____    SIGNATURE OF ATTORNEY OF RECORD _____

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.